IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID ANDERSEN, husband,
and BONNIE ANDERSEN, wife,

        Plaintiffs,

v.                    //    CIVIL ACTION NO. 1:07CV2
                                    (Judge Keeley)

TIM HAYNES, SR., individually
and in his capacity as agent
and employee of Sistersville,
CITY OF SISTERSVILLE, a West
Virginia municipal corporation,

        Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is the motion for summary judgment filed by the defendants, Tim Haynes, Sr. ("Haynes"), and the City of Sistersville ("the City"). For the reasons that follow, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the motion, **DISMISSES** all of the plaintiffs' federal and state claims as to the City, **DISMISSES** the state law claims of false imprisonment and defamation as to Haynes, **GRANTS** Haynes's motion for qualified immunity as to the Eighth Amendment § 1983 claim, but **DENIES** Haynes's motion for summary judgment as to all other claims.

## I. FACTS

Plaintiffs David Andersen ("Andersen"), a former high school principal, and his wife, Bonnie Andersen (jointly "the Andersens"), reside in the City of Sistersville, West Virginia, where defendant

<u>MEMORANDUM OPINION AND ORDER</u>

Haynes was employed as a police officer.  Over a period of several years in the early 2000s, the Andersens' adult son, Christian Andersen, had an on-again off-again relationship with a woman named Michelle Phillips ("Phillips"), which resulted in the birth of a child.  Eventually, Phillips ended her relationship with Christian Andersen, and began a relationship with Tim Haynes, Jr., the son of defendant Haynes. This was also an on-again off-again relationship, during which Phillips went back to Christian Andersen on at least one occasion.  The Andersens allege a long history of conflicts among their son, Phillips, and Tim Haynes, Jr., some of which resulted in intervention by law enforcement.  During one such incident, Christian Andersen allegedly spit in Tim Haynes, Jr.'s face, Pl's Ex. A, p. 57-58; in two other incidents, Phillips and Tim Haynes, Jr. allegedly burglarized Christian Andersen's home, stealing a valuable baseball card collection and his dog.  <u>Id.</u> at 87-97.

On at least several occasions, Phillips and Tim Haynes, Jr. approached Haynes for advice on how to handle their conflicts with Christian Andersen.  At his deposition, Haynes testified that he advised Phillips and his son to avoid contact with Christian Andersen and to contact law enforcement officers other than himself if they needed help.  Pl's Ex. B, p. 93-94, 96.  Haynes himself had

<u>**MEMORANDUM OPINION AND ORDER**</u>

a conversation about the matter with the Sistersville chief of police, who advised Haynes to "stay out of it," unless something occurred right in front of him. Pl's Ex. B, p. 100-101. The Chief additionally advised Haynes to refer any problems to other officers. <u>Id.</u>

The dispute at issue in this case originated during the early morning hours of March 5, 2005. Christian Andersen had been drinking at a bar with a friend throughout the evening of March 4, 2005, and on into the morning of March 5, 2005, when he made a threatening phone call to Phillips, who had recently broken up with him and reunited with Tim Haynes, Jr. Pl.'s Ex. A, p. 152. The Andersens allege that Haynes followed Christian Andersen and his friend home from the bar. <u>Id.</u> at 153. On his arrival home, Christian Andersen made a vulgar gesture at Haynes by showing him his middle finger, and the two engaged in a verbal confrontation. Pl's Ex. B, p. 116-17.

Haynes then arrested Christian Andersen for "public intoxication," although, according to the Andersens, there was no evidence of intoxication developed until after their son was arrested. Pl's Ex. B, p. 122-29. In his deposition, Christian Andersen testified that, after he was placed in handcuffs by Haynes, Haynes shoved him and said "if you ever spit in my son's

face again, I'm gonna come up here off duty and kick your f***ing ass." Pl's Ex. A, p. 147. Haynes eventually released Christian Andersen and cited him for public intoxication.

Later, during the afternoon of March 5, 2005, Haynes returned to Christian Andersen's residence with a trooper from the West Virginia State Police and two Tyler County Sheriff's deputies to serve arrest warrants on him for allegedly assaulting Phillips and harassing her over the telephone. Pl's Ex. B, p. 150-152. Christian Andersen was not at home when the officers arrived. Eventually, he returned to his residence in a car with his father, at which time the officers arrested him.

As the officers were arresting Christian Andersen, David Andersen got out of the car and began to walk around to the other side where the officers were handcuffing his son. Id. at 163-65. Haynes claims that, as Anderson walked toward him, he held up his arm and told Andersen, "That's far enough," but Andersen proceeded to walk into him. Id. at p. 165. Andersen, however, alleges that Haynes stepped towards him with no warning and grabbed his arm. Pl's Ex. C, p. 107. He also asserts that he told Haynes to "get your hands off of me," to which the deputies and troopers responded with "a flurry of swearing and screaming and all kinds of filthy language . . . ." Id. Haynes asserts that it was Andersen who

4

started yelling, and that he does not recall the other officers using profanity. Pl's Ex. B, p. 167. Ultimately, the officers transported Christian Andersen to the Tyler County Magistrate Court, while David Andersen followed separately to post bond for his son.

**1.  Haynes's Version of the Disputed Event on March 5, 2005.**

Approximately one hour after Christian Andersen was transported by the officers to the magistrate court, Haynes learned that, pursuant to a domestic violence petition issued earlier that day, Phillips was traveling to Christian Andersen's residence to pick up her child, who had been staying there with Bonnie Andersen. Pl's Ex. D. According to Haynes, he then traveled to Christian Andersen's residence and stationed himself across the street "in the event violence or some other disturbance erupted during the exchange." <u>Id.</u> Phillips, however, retrieved her child without incident and left. <u>Id.</u> Haynes alleges that, while he was returning to his patrol car, Christian Andersen's next-door neighbor, Jon Cox ("Cox"), approached him to talk. <u>Id.</u> While Haynes was chatting with Cox on the far side of the street, David Andersen arrived at Christian Andersen's residence and pulled his vehicle into the driveway. <u>Id.</u> Haynes alleges that Andersen exited his vehicle, rapidly crossed the street, stood approximately

one foot in front of Haynes and started yelling "you're a f***ing piece of shit," "you're a f***ing disgrace to that uniform" and other insults.  Def. Ex. 2 at 220.

Haynes states that he told Andersen to step back, and said that if he did not do so, he was going to jail and that he could not talk like that in a city street.  Id. at 221.  Andersen allegedly continued to yell profanities at Haynes, but ultimately went back over to his car, where his wife was standing by.  Id. at 222-24, 228. Haynes alleges that, as he was preparing to leave, Andersen again entered the street and began to yell profanities. Id. at 228-29.  This time, according to Haynes, he told Andersen he was under arrest, and instructed him to place his hands on his car. Id. at 229.  Rather then cooperating, Haynes contends that Andersen got in his car and started it.  Id. at 232.  As the car began rolling backward, Haynes tried to reach through the open driver-side door to put the gear in park.  Id. at 235.  Andersen then allegedly placed it in park, after which Haynes grabbed his wrist and told him to get out of the vehicle because he was under arrest. Id.

According to Haynes, Andersen then pulled Haynes into the vehicle on top of him and a fight ensued.  Id. at 236.  He alleges that he yelled out to Cox, who was standing nearby, to call 911.

Pl's Ex. D.  During the scuffle, Haynes alleges that Andersen struck him in the face several times, hit him in the eye, and, at one point, he felt Andersen's finger go into his mouth so he bit down on it to control Andersen's hand.  Id.

Haynes claims that he eventually gained control of Andersen's hands and, with the help of Cox, retrieved his "OC spray," also known as pepper spray, and used it against Andersen.  Id.  A further scuffle ensued, during which Haynes pushed his thumb against Andersen's eyebrow and forced his head back.  Id.  Haynes then regained partial control of Andersen, but Andersen refused to comply with Haynes' order to get out of the car, so Haynes pulled Andersen's feet from the car and forced him to a standing position. Id.  Then, to prevent further resistence, he pushed Andersen down into the space between the door and windshield.  Id.  Haynes cuffed Andersen, forced him onto the ground into a prone position, and held him like that until "help arrived."  Id.

**2. The Andersens' Verison of the Disputed Event on March 5, 2005.**

The Andersens tell a very different story.  Bonnie Andersen asserts that, when Michelle Phillips arrived to pick up her child, Haynes stood at the foot of the stairs leading to the porch.  Pl's Ex. E, p. 129.  When she questioned Phillips regarding her right to take the child, Phillips turned to Haynes, who advised Bonnie

Andersen that unless she turned over the child he would arrest her. Id. at 134. Bonnie Andersen then asked Haynes for documentation confirming Phillips's authority to take the child, to which Haynes allegedly replied "I don't need it. I wear a badge." Id. Eventually, Bonnie Andersen relinquished the child to Phillips, after discussing the situation with her husband over the telephone. Id. at 140. She contends that, as Phillips and Haynes left the house with the child, they "high-fived" each other. Id. at 143. Phillips immediately left with the child.

When David Andersen arrived at his son's residence approximately 20 minutes later, he noticed Haynes standing across the street with Cox, glaring at him. Pl's Ex. C, p. 134. Andersen walked across the street towards Cox and Haynes, and, while standing approximately three to four feet away, said to Haynes "You're a disgrace to the uniform that you wear. It takes a real hero to handcuff a man, threaten him, rough him up while you've got the handcuffs on him, and then mock him. He's going to have to pay $200 for this public intoxication." Id. Andersen alleges that Haynes then stepped up into his face, and said, "Why don't we just take care of this right now." Id. at 135. According to Andersen, he responded, "I'm not afraid of you. I know how to fight you," to

which Haynes allegedly replied, "What do I have to do to have you hit me? Close my f***ing eyes?"  Id. at 146-47.

Andersen asserts that he then noticed that his wife had walked out of the house, and he turned to walk back up the driveway towards her.  Pl's Ex. C, p. 150.  As he walked away, Haynes repeatedly stated, "Have a nice day, sir" in a mocking tone.  Id. at 151.  Further verbal exchanges occurred between the Andersens and Haynes, during which Andersen allegedly questioned Haynes about why he was there.  Id.  According to Andersen, as he was about to enter his car to return to the jail to pick up his son, he once again asked Haynes to quit the property and leave them alone.  Id. at 158.  Haynes then charged across the street towards Andersen's car.  Id.  Seeing him coming, Andersen got in the car and yelled at his wife to do the same.  Id.

Andersen claims that, at this point, Haynes prevented him from closing the car door and began screaming at him to get out of the car.  Id. at 159.  Andersen denies he heard Haynes tell him he was under arrest, however.  Id. at 160.  He then told his wife to call the police, which she did.  Id. at 159.  She then handed him the phone.  Id.  When Andersen reached to take the phone, Haynes allegedly lunged into the car, got on top of him, and stuck his left hand under Andersen's glasses and into his eye.  Id.  Andersen

9

believed that Haynes was trying to pop his eye out of the socket.

Id. at 163.  He attached a photo to his brief depicting the

resulting damage to his right eye.  Pl's Ex. H.

During the course of the struggle, Andersen reached behind

himself to try to push Haynes off, and claims that is when Haynes

bit his finger. Pl's Ex. C. at 163.  After some further scuffling,

Haynes pulled Andersen out of the car and pushed him between the

door and windshield.  Id. at 164.  Haynes then handcuffed him,

forced him approximately forty feet into the street and pushed him

down to the pavement with his knee in Andersen's back.  Id.

Andersen, who already suffered from two herniated disks and

previously had undergone reconstructive surgery on his back, claims

that Haynes's actions caused him severe pain.  Id.

Eventually, other police officers arrived on the scene, took

Andersen into custody, transported him to a hospital for medical

treatment, charged him with disorderly conduct, obstructing an

officer/resisting arrest, and battery of an officer, and kept him

in jail overnight.  Def's Ex. 7.  The charges were later dismissed

pursuant to a diversionary agreement.  Def.'s Ex. 8.  Subsequently,

Haynes was dismissed from the Sistersville police force for

unrelated conduct.  Pl.'s Ex. I.

Andersen alleges that Haynes's use of force exacerbated his back injury and he can no longer work as a result.  Pl's Ex. C, p. 239-40.  He further alleges that he suffered bleeding from his right eye, and temporary injuries to his finger from the bite and to his wrists from the handcuffs being too tight, as well as scrapes and bruises.  Id. at 240-41.

### 3. Cox's Version of the Disputed Event on March 5, 2005.

Cox, who was present at the scene throughout the scuffle, has provided conflicting reports as to what he observed that day.  At the time of the incident, he gave a statement to the police indicating that Andersen had been very upset, used profane and vulgar language towards Haynes, and initiated the fight in the car. Def's Ex. 9.  Approximately one month later, however, when he discussed the incident with Andersen's attorney, he recalled hearing Haynes challenge Andersen to a fight, and stated that, in his opinion, Haynes was "totally out of line and trying to aggravate Andersen."  Pl's Ex. F, p. 103-104.

Later, when deposed, Cox repeatedly stated that he could not remember much of the incident.  He did, however, remember that Haynes and Andersen were "arguing back and forth," and that Andersen told Haynes he was "a disgrace to the badge."  Def.'s Ex. 6, p. 45-46.  He further recalled that Haynes said something to

Andersen about hitting him, but Cox could not remember exactly what Haynes said.  <u>Id.</u> at 53.  He did recall, however, that, when Andersen returned to his car, got in and left the door open, Haynes walked up to the car, wedged himself between the open door and the car, and the men "talked back and forth."  <u>Id.</u> at 49.  He stated that Andersen then started the car, after which the men began to scuffle.  <u>Id.</u> at 52.

Cox also remembered that, during the scuffle, Haynes pulled out an "OC canister" to subdue Andersen.  <u>Id.</u> at 66.  When Haynes dropped it during the course of the scuffle, Cox picked it up and returned it to him.  <u>Id.</u>  Cox states that he handed it to Haynes because "I figured, you know, this is - - this is the only way this is going to stop."  <u>Id.</u>  He does not recall the events that followed because, at that point, he left to go comfort Bonnie Andersen.  <u>Id.</u> at 69.

## II.  PROCEDURAL HISTORY

The Andersens filed this lawsuit on January 3, 2007, and shortly thereafter filed an Amended Complaint, alleging that Haynes had violated Andersen's First, Fourth, Eighth and Fourteenth Amendment rights by battering and arresting Andersen in retaliation for the exercise of his First Amendment right to free speech, by arresting him without probable cause or justification, by using

excessive force during the arrest, and, thereafter, inflicting physical harm on him while he was a prisoner, in violation of his Eighth Amendment right to be free of cruel and unusual punishment. They assert that Haynes engaged in all these acts while acting under color of state law, and further contend that the City of Sistersville ratified the acts, thereby depriving Andersen of these rights. Additionally, the Andersens allege violations of West Virginia state law, including the West Virginia Constitution, the tort of outrage, intentional infliction of emotional distress, battery, defamation, negligent retention and hiring, false imprisonment and loss of consortium.

In their pending motion, Haynes and the City move for summary judgment on all counts of the Amended Complaint. The City contends that there is no evidence to support a constitutional claim against it because no evidence indicates that any of the alleged violations were perpetrated pursuant to any "custom" or "policy" of the City. Because a municipality cannot be held liable for a constitutional violation based solely on the doctrine of respondeat superior, see Collins v. City of Harker Heights, Texas, 503 U.S. 115, 122 (1992), the City seeks dismissal of the constitutional claims against it, and additionally asserts that it is immune from all of the

Andersens' state law claims pursuant to W. Va. Code § 29-12A-4(b)(1), the Governmental Tort Claims and Insurance Reform Act.

Haynes claims that, pursuant to the doctrine of qualified immunity, he is immune from the constitutional violations alleged by Andersen. He further alleges that he is immune from the state law tort claims under to W. Va. Code § 29-12A-4(c) because he acted in good faith and within the scope of his employment. Finally, Haynes and the City contend that Andersen's claims for defamation and false imprisonment are barred by the statute of limitations.

In their response, the Andersens concede that David Andersen's false imprisonment claim is barred by the statute of limitations, but contend that his defamation claim was brought within the applicable time period. They do not respond to the City's assertions regarding the claims against it. They do, however, dispute Haynes's contentions that he is protected by qualified immunity and argue that a number of genuine issues of material fact remain with regard to his actions in this case.

### III.   STANDARD OF REVIEW

A court should enter summary judgment only when no genuine issue of material fact exists as to a claim, and thus the claim may be decided as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of

14

demonstrating that there are no genuine issues of material fact.

Id. Once the movant has made such showing, the opposing party must present probative evidence establishing that a genuine issue of material facts exists as to each element of its prima facie case. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In considering summary judgment motions, the Court must review the evidence in the light most favorable to the non-moving party, in this case, the Andersens. Zahodnick v. International Bus. Machs. Corp., 135 F.3d 911, 913 (4th Cir. 1997).

## IV.  LEGAL ANALYSIS

### A.  City of Sistersville

#### 1. Section 1983 Claims

The City contends that Andersen's federal constitutional claims against it, pursuant to 42 U.S.C. § 1983, must be dismissed because he has presented no evidence that any of the alleged constitutional violations were committed pursuant to a policy or custom of the City. In Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691 (1978), the United States Supreme Court concluded that individuals may sue municipalities under 42 U.S.C. § 1983, alleging constitutional violations, when it can be proved that the violation occurred pursuant to a custom or policy of the municipality, even where such custom or policy is

unofficial. Liability, however, is limited to situations in which the unconstitutional act is committed pursuant to municipality policy or custom. Liability cannot be based solely on the unauthorized acts of an employee; "in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id.

In this case, Andersen alleges that the City violated his constitutional rights by ratifying Haynes's actions "and further deprived [] Andersen of his civil rights, including rights secured and guaranteed to him under U.S. Const. Amds. 1, 4, 8, and 14 . . . ." Amended Complaint, Dtk. No. 3, p. 9. Andersen does not, however, allege that Haynes acted pursuant to a custom or policy of the City. Moreover, although the City contended in its brief in support of its motion for summary judgment that no evidence supports the § 1983 claims against it, Andersen failed to respond in any way to this argument in his response brief. Consequently, even when the evidence is viewed in the light most favorable to him, Andersen has failed to establish that a genuine issue of material fact exists to support his § 1983 claims against the City. See Walker v. Prince George's County, Maryland, --- F.3d ----, 2009 WL 234614 (4th Cir. July 30, 2009) ("We agree . . . that appellants failed to make any allegations in their complaint in regards to the

16

existence of the County's policy, custom, or practice, therefore failing to plead a viable <u>Monell</u> claim.") (internal citations omitted).  The Court, therefore, **GRANTS** summary judgment to the City on those claims, and **DISMISSES** Andersen's § 1983 claims against it.

### 2.  State law claims

The City next contends that it is immune from the state law violations alleged by Andersen pursuant to W. Va. Code § 29-12A-4(b)(1), which provides in pertinent part, as follows:

> Except as provided in subsection (c) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function: Provided, That this article shall not restrict the availability of mandamus, injunction, prohibition, and other extraordinary remedies.

Subsection (c) provides specific instances in which a political subdivision may be held liable for damages in a civil case, including liability for injury, death, or loss to persons or property caused by (1) negligent operation of a vehicle by an employee of a political subdivision, (2) "negligent performance of acts by their employees while acting within the scope of employment," (3) negligent failure to keep public roads and other public grounds in repair or free from nuisance, and (4) negligence

of employees that occurs on the political subdivisions' property.

Id. at § 29-12A-4(c).  As to subsection (5), § 29-12A-4(c),

provides:

> In addition to the circumstances described in subsection
> (c)(1) to (4) of this section, a political subdivision is
> liable for injury, death, or loss to persons or property
> when liability is expressly imposed upon the political
> subdivision by a provision of this code. Liability shall
> not be construed to exist under another section of this
> code merely because a responsibility is imposed upon a
> political    subdivision    or    because    of    a    general
> authorization that a political subdivision may sue and be
> sued.

In this case, the City argues that all but one of the asserted

state law tort claims are intentional torts, rather then claims

sounding in negligence.  Specifically, it points out that, in his

Amended Complaint, Andersen alleges false imprisonment, intentional

infliction of emotional distress, battery and defamation against it

and Haynes.  Because West Virginia Code § 29-12A-4(c) provides that

political    subdivisions    only    may    be    sued    for    negligence    of

employees, and not for intentional torts those employees may have

committed, the City argues that it is immune from suit on these

claims.  See Mallamo v. Town of Rivesville, 477 S.E.2d 525, 534 (W.

Va. 1996) (political subdivisions are not liable for intentional

malfeasance by their employees).

In addition, the City points out that the one claim of negligence Andersen asserted against it, negligent hiring and retention, is not among the exceptions to municipality immunity listed in W. Va. Code § 29-12A-4, which only permits suits against political subdivisions for negligence committed by employees of the subdivision. It does not except suits alleging negligent acts by the subdivision itself.

Again, Andersen has failed to oppose or otherwise address any of these arguments in his response to the motion for summary judgment. Accordingly, because no genuine issue of material fact exists regarding to the liability of the City of Sistersville, the Court **GRANTS** the City's summary judgment motion and **DISMISSES** all the state law claims against it.

**B.  Defendant Haynes**

**1.   Section 1983 claims**

Andersen's constitutional claims against Haynes arise under 42 U.S.C. § 1983, which permits individuals to sue state governmental officials who, while acting under the color of state law, deprive those individuals of a constitutional right. Andersen asserts that Haynes violated his constitutionally-protected rights under the First, Fourth, Eighth and Fourteenth Amendments. Specifically, Andersen contends that Haynes arrested him without probable cause

in violation of his rights under the Fourth and Fourteenth Amendments to be free from unlawful seizure, and in retaliation for Andersen's exercise of his protected First Amendment right to remonstrate and challenge the authority of a law enforcement officer.  Andersen further contends that, in the course of Haynes's illegal arrest, Haynes used excessive force in violation of the Fourth and Fourteenth Amendments.  Finally, Andersen alleges that, after he was taken into custody, Haynes inflicted physical harm on him in violation of Andersen's Eighth Amendment right to be free of cruel and unusual punishment.

Haynes seeks dismissal of Andersen's § 1983 claims on the basis of qualified immunity.  Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Supreme Court has noted that the doctrine "balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, -- U.S. ---, 129 S. Ct. 808, 815 (2009).  Accordingly,

"[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Willingham v. Crooke</u>, 412 F.3d 553, 559 (4th Cir. 2005) (<u>quoting</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

It is beyond peradventure that Haynes was performing discretionary functions while acting in his official capacity when the disputed events in this case took place. The first question therefore is whether his conduct did, in fact, violate an established constitutional right. The Supreme Court of the United States has set forth a two-step test for making this determination. Specifically, a court must consider whether the facts, when taken in the light most favorable to the non-moving party, establish that a constitutional right was violated. <u>Pearson</u>, 129 S. Ct. at 815-16. The court also must determine whether the right at issue was "clearly established" at the time of the alleged misconduct. <u>Id.</u> at 816. Although earlier precedent had mandated that these steps be considered sequentially, <u>see</u> <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court reconsidered its position in <u>Pearson</u>, and concluded that courts may exercise their sound discretion in determining which of the two prongs should be addressed first in light of the particular case under consideration. <u>Pearson</u>, 129 S. Ct. at 818.

For a right to be "clearly established," it must be:

'sufficiently clear that a reasonable official would understand that what he is doing violated that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'

Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009) (quoting

Anderson v. Creighton, 483 U.S. 635, 640, 107 (1987)).

Importantly, when considering the question of qualified immunity at the summary judgment stage, a court must only decide the purely legal questions of whether (1) a constitutional violation is alleged, and (2) if so, whether the constitutional right was clearly established at the time of the alleged violation. Willingham, 412 F.3d at 559. When a genuine issue of material fact exists as to whether the conduct that allegedly violated the right actually occurred, that issue must be reserved for trial.    Id.

Therefore, to the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.

Id. at 560.

## MEMORANDUM OPINION AND ORDER

### a.    First Amendment Free Speech Claim

Andersen's first § 1983 claim alleges that Haynes violated his First Amendment right to freedom of speech, by retaliating against him for exercising his constitutional right to remonstrate and challenge the authority of a police officer.  Although Haynes acknowledges that Andersen has a right to challenge him verbally, he contends that he reasonably believed Andersen's actions established probable cause to arrest him under West Virginia's disorderly conduct statute.

West Virginia Code § 61-6-1b, which criminalizes disorderly conduct, states:

> Any person who, in a public place, . . . disturbs the peace of others by violent, profane, indecent or boisterous conduct or language or by the making of unreasonably loud noise that is intended to cause annoyance or alarm to another person, and who persists in such conduct after being requested to desist by a law-enforcement officer acting in his lawful capacity, is guilty of disorderly conduct, a misdemeanor and, upon conviction thereof, may be committed to the custody of the division of corrections for twenty-four hours or fined not more than one hundred dollars . . . .

Haynes contends that, by yelling profanities at Haynes while standing in the street in front of his son's house, Andersen "disturb[ed] the peace of others" by engaging in profane, indecent and boisterous conduct while in a public place.  See id.  Haynes claims that he asked Andersen to stop yelling and return to his

son's property, but that Andersen "persist[ed] in [the unlawful] conduct after being asked to desist by a law enforcement officer acting in his lawful capacity." See id. For these reasons, Haynes contends that he reasonably believed Andersen to be guilty of disorderly conduct, and thus he did not arrest him in retaliation for his protected speech.

To determine whether Haynes is entitled to qualified immunity as to the alleged First Amendment violation, the Court must first determine whether, when the facts are viewed in the light most favorable to Andersen, a constitutional violation occurred, and second, whether the right violated was clearly established at the time of the incident.

### i. Constitutional Violation

The First Amendment right to free speech includes not only the affirmative right to speak but also the right to be free from retaliation by a public official for the exercise of that right. Suarez Corp. Industries v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). In order to make out a claim under § 1983 based on retaliation for protected speech, a plaintiff must demonstrate that (1) his or her speech was protected, (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, and (3) a causal relationship

exists between the speech and the defendant's retaliatory action. Id. at 685-86.

Haynes does not dispute that, when Andersen challenged him about his involvement in Christian Andersen's arrest earlier that day, Andersen's speech was constitutionally protected.  The United States Supreme Court has held that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," and, thus, arresting a person solely on the basis of speech that questions or opposes police action violates the First Amendment.  City of Houston v. Hill, 482 U.S. 451, 462-63 (1987).  Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  Id. at 463.  In so finding, the Supreme Court recognized that "in the face of verbal challenges to police action, officers . . . must respond with restraint."  Id. at 471.

Of course, limits to such speech exist, such as where speech is "'shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'"  Id. at 461 (quoting Terminiello v. Chicago, 337 U.S. 1, 4 (1949).  For example, in Smith v. McCluskey, 126 Fed. Appx. 89, * 5 (4th Cir. March 11, 2005) (unpublished), the

Fourth Circuit held that a black man who was being arrested by white officers did not have a protected right to yell that he was being treated like Rodney King, when doing so caused a crowd of young men to gather, creating a "potentially volatile and uneasy situation."  In so holding, the Fourth Circuit recognized the right enunciated in <u>City of Houston</u> to verbally criticize and challenge police actions, but found that the particular words used in the situation under review created a clear and present danger of violence.  <u>Id.</u>

Taking Andersen's allegations of the events that unfolded on March 5, 2005 as true, and recognizing that significant factual disputes exist, he has presented sufficient facts to establish that Haynes retaliated against him for his constitutionally protected speech.  <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197 (2004) (Directing courts to analyze facts relating to qualified immunity claims "in the light most favorable to the party asserting the injury").  Specifically, Andersen alleges that, when he arrived at his son's house to retrieve his checkbook, he discovered Haynes standing across the street, glaring at him.  Pl's Ex. C, p. 133-34. Notably, the only other individuals in the area were Cox and Bonnie Andersen.

Andersen admits that he was frustrated with what he perceived as Haynes's unfair treatment of his son, and, that, upon seeing Haynes standing across the street staring at him, he decided to challenge Haynes about his conduct. Id. at 136-137. After leaving his car, Andersen claims he walked towards Haynes, entered a public street to do so, but stopped approximately three to four feet away from Haynes. Id. at 134. He then called Haynes a disgrace to his uniform, and stated that "it takes a real hero" to "rough up" and mock a man who is already handcuffed, referring to Haynes's treatment of Christian Andersen. Id.

According to Andersen, Haynes then stepped up into his face and challenged him to fight. Id. at 135. Andersen alleges that, after declining to fight, he asked Haynes why he was there, told him to leave, and walked back across the street to his son's property. Id. at 148, 150. Haynes then mocked Andersen and his wife, yelling "have a nice day" in a sarcastic tone. Id. at 151. When Andersen again challenged him about why he was there, Haynes allegedly "charged" across the street towards Andersen and screamed at him to get out of his car. Id. at 158. It is at this point that Haynes asserts he had decided to arrest Andersen for disorderly conduct and the struggle to effect that arrest ensued. Andersen denies using any profanity during the altercation, but

asserts that Haynes frequently used such words.  Pl's Ex. 3, p. 223.

On these facts, the Court cannot find that Andersen's words raised a "clear and present danger of a serious and substantive evil" that would remove them from the protection of the First Amendment.  See City of Houston, 482 U.S. at 461.  First, unlike the speech in Smith v. McCluskey, 126 Fed. Appx. at * 5, Andersen's words were directly solely at Haynes and were not designed to, or likely to, incite bystanders.  Even though Andersen called Haynes a disgrace to his uniform and challenged his prior actions towards Christian Andersen, the Supreme Court has stated that police officers, who are held to a higher standard then ordinary citizens, are expected to exercise significant restraint in the face of verbal challenges.  Id. at 462.  Again, such "[s]peech is often provocative and challenging," but is nevertheless protected unless likely to produce a clear and present danger of a serious substantive evil.  Id. at 461 (quoting Terminiello, 337 U.S. at 4).

Under the facts alleged by Andersen, the Court concludes he has demonstrated that (1) he was engaged in protected speech, (2) his arrest effectively silenced his speech, and (3) Haynes arrested him as a result of that speech.  See Suarez Corp., 202 F.3d at 685-86.  Consequently, when viewed in the light most favorable to

Anderson, these facts establish the three necessary elements to "make out a violation of a constitutional right" with respect to his first amendment retaliation claim.  <u>Pearson</u>, 129 S.Ct. at 816.

## ii.  Clearly Established Right

Because, when viewed in the light most favorable to the plaintiff, the facts indicate that a constitutional violation occurred, the Court turns next to whether the right violated was clearly established at the time of the incident.

> The right that an official is alleged to have violated must be "clearly established" not merely as a general proposition (in the way, say, the right to due process is clearly established), but "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

<u>Cole v. Buchanan County School Bd.</u>, --- F.3d ----, 2009 WL 1336720 *2 (4th Cir. May 14, 2009) (<u>quoting</u> <u>Creighton</u>, 483 U.S. at 640). This prong of the qualified immunity analysis therefore "turns on 'the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'"  <u>Id.</u> (<u>quoting</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999)).

As previously discussed, the Supreme Court described the right of an individual to verbally challenge the authority of a police

officer in its 1987 decision in <u>City of Houston</u>, where it stated that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." 482 U.S. at 462-63. The Fourth Circuit, moreover, explicitly recognized this right before the events at issue in this case occurred. <u>See</u> <u>e.g.</u>, <u>Wilson v. Kittoe</u>, 337 F.3d 392, 399 (4th Cir. 2003). Thus, it is beyond debate that Andersen's right to verbally challenge Haynes's actions without risking arrest was clearly established at the time of the events in this case.

Furthermore, a reasonable police officer in Haynes's position would have known that arresting a citizen for verbally challenging the officer's authority violated the Constitution. Indeed, Haynes does not deny that Andersen had a right to challenge him verbally; rather, he disputes Andersen's version of the events, claiming Andersen went beyond verbal challenges to act in a way that disturbed the peace. At the summary judgment stage, however, when the facts are to be viewed in the light most favorable to the non-moving party, Haynes is not entitled to qualified immunity on this § 1983 claim.

30

### b.   Fourth Amendment Unreasonable Seizure Claim

Andersen alleges that Haynes violated his Fourth Amendment
right to be free of unreasonable seizures by arresting him without
probable cause in retaliation for his constitutionally protected
speech.   Haynes asserts that he had probable cause to believe
Andersen was violating West Virginia's disorderly conduct statute,
and further contends that, because Andersen resisted arrest, he
developed probable cause to arrest Andersen on that basis as well.

### i.  Constitutional Violation

The Fourth Amendment protects the right of individuals to be
"secure in their persons . . . against unreasonable
seizures . . . ." U.S. Const. amend. IV.  "[A] warrantless arrest
by a law officer is reasonable under the Fourth Amendment where
there is probable cause to believe that a criminal offense has been
or is being committed," Devenpeck v. Alford, 543 U.S. 146, 152
(2004), and the "validity of the arrest does not depend on whether
the suspect actually committed a crime." Michigan v. DeFillippo,
443 U.S. 31, 36 (1979).   Thus, if Haynes had probable cause to
believe that Andersen was engaged in disorderly conduct, as defined
under West Virginia Code § 61-6-1b, he is entitled to qualified
immunity as to this claim.

31

<u>MEMORANDUM OPINION AND ORDER</u>

When viewed in the light most favorable to Andersen, however, the facts alleged establish that he was arrested without probable cause for engaging in a protected activity, thus violating his Fourth Amendment right to be free from unreasonable seizures.  As discussed earlier, Andersen asserts that Haynes arrested him in retaliation for his verbal challenges, a protected activity under the First Amendment.  Although Haynes asserts that he had probable cause to believe Andersen was engaged in disorderly conduct, Haynes could not have acted in a lawful capacity by asking Andersen to desist from engaging in constitutionally protected speech.  <u>See</u> W. Va. Code § 61-6-1b (individuals are guilty of disorderly conduct when they "persist[] in such conduct after being requested to desist by a law-enforcement officer acting in his lawful capacity.").  Thus, because Andersen's speech was constitutionally protected, Haynes did not have probable cause arrest Andersen for disorderly conduct.[1]

---

[1]     Haynes argues that he had probable cause to arrest Andersen for disorderly conduct based on Andersen's conduct, rather than his speech.  He argues that Andersen spoke to him in a loud, boisterous manner, which violates the disorderly conduct statute. Whether Haynes arrested Andersen based on the volume and tone of his voice, or based on the content of his speech, however, is a disputed question of fact for the jury to decide.

Because Andersen's allegations, if proven, would establish that the original arrest was not supported by probable cause, Haynes's second argument, that he had probable cause under West Virginia Code § 61-5-17 to arrest Andersen for obstructing an officer by resisting arrest, fails as well.  Under that statute:

> Any person who by threats, menaces, acts or otherwise, forcibly or illegally hinders or obstructs, or attempts to hinder or obstruct, any law-enforcement officer . . . acting in his or her official capacity is guilty of a misdemeanor. . . .

W. Va. Code § 61-5-17(a).

Haynes contends he had probable cause to believe that Andersen was in violation of this statute when Andersen refused to submit to Haynes's orders to step out of his car and submit to being arrested.  However, long-standing precedent in West Virginia holds that individuals have the right to resist unlawful arrests.  State v. Holmes, 23 S.E.2d 61, 63 (W. Va. 1942); State v. Clark, 63 S.E. 402, 408 (W. Va. 1908).  Here, Andersen believed that Haynes was unlawfully arresting him in retaliation for his protected speech and because of Haynes's personal vendetta against Andersen's family.  Indeed, Andersen alleges that, only a short time before, Haynes had challenged him to "just take care of this right now," which he understood to mean that Haynes wanted to engage him in a fight over their families' dispute.  Pl's Ex. C, p. 146-48.  Thus,

when the facts are viewed in this light, Andersen's belief that
Haynes's attempts to arrest him were unlawful is reasonable, and,
because West Virginia law permits individuals to resist unlawful
arrest, Haynes could not have reasonably believed that Andersen's
resistance under those circumstances constituted probable cause to
arrest him.

### ii.  Clearly Established Right

In the context of the Fourth Amendment right to be free from
unreasonable seizures, "[a] violation of a clearly established
right occurs when an arrest is made in a situation in which no
reasonable police officer could believe that probable cause is
present to support the arrest." Rogers v. Pendleton, 249 F.3d 279,
290 (4th Cir. 2001).  Indeed, "[q]ualified immunity is not lost
when an officer violates the Fourth Amendment unless a reasonable
officer would know that the specific conduct at issue was
impermissible." Id. at 285 (citing Creighton, 483 U.S. at 638-39).

Viewed in the light most favorable to Andersen, the facts in
this case establish that Andersen engaged in constitutionally
protected speech by challenging Haynes's authority as a police
officer.  Haynes became upset by Andersen's speech and challenged
him to a fight.  Andersen then retreated to his car, but Haynes
followed him. Under this factual scenario, Haynes could not have

reasonably believed he had probable cause to arrest Andersen for disorderly conduct.[2]

Moreover, as discussed earlier, if the first attempt to arrest Andersen was not based on probable cause, then Andersen was within his right to resist that arrest and Haynes cannot establish that he had probable cause to arrest Andersen for obstructing an officer. Consequently, at this stage of the proceedings, and based on disputed material facts, Haynes is not entitled to qualified immunity as a matter of law as to Andersen's claim of unreasonable seizure under the Fourth Amendment.

### c.   Fourth Amendment Excessive Force Claim

Turning next to Andersen's allegation that Haynes used excessive force during the illegal arrest in violation of Andersen's Fourth and Fourteenth Amendment rights, significantly,

---

[2]   Notably, Haynes did not have a justifiable law-enforcement reason to have been at Christian Andersen's residence at the time of the incident.   While Haynes contends that he originally traveled to Christian Andersen's residence to oversee the transfer of the child from Bonnie Andersen to Phillips, Andersen points out that at least two other officers had been on road patrol within the proceeding hour who likely could have assisted Phillips in retrieving her child.   Pl's Ex. B, p. 195. Indeed, the fact that Haynes chose to involve himself in this conflict without even attempting to find another officer to handle the situation, despite having been advised by his chief of police to avoid all situations related in any way to Christian Andersen and Phillips, lends credence to Andersen's assertion that Haynes arrested him based solely on personal motivations.

Andersen denies that Haynes ever told him he was under arrest. Pl's Ex. C, p. 160.   Instead, he contends that, as he was attempting to get into his car to drive to the jail to get his son, Haynes, who had been standing across the street, charged at him, yelling "get out of the car." Id. at 160, 162-63.  Before Andersen could shut the car door, however, Haynes lunged into the car on top of him, and stuck his left hand under Andersen's glasses and put his finger into Andersen's eye, in a manner that made Andersen believe Haynes was trying to pop his eye out of the socket.  Id. at 163.   He further alleges that, as he was lying face down with Haynes lying on top of him, he reached around behind himself to try to push Haynes off, and that Haynes then bit his finger.  Id.

After a further scuffle, in which Haynes used pepper spray to subdue Andersen, Haynes pulled Andersen out of the car, and pushed him between the door and windshield.  Id. at 164.  Once he had handcuffed Andersen, Haynes grabbed him "by the back" and ran him approximately forty feet from the car into the street.  Id. Haynes then slammed Andersen down onto the asphalt, pushed his knee into his back, and proceeded to "jump[] up and down on [him] on [his] back." Id. at 164-65.  Andersen asserts that, during all this, he repeatedly told Haynes "I'm hurt. Get off me." Id. at 165. Andersen further points out that Haynes is approximately twenty

years younger than he, and that he suffered from pre-existing back injuries that made him less mobile. Moreover, the injuries he sustained as a result of Haynes's attack exacerbated his pre-existing back condition, causing him to be unable to work and to suffer continuing pain.

### i. Constitutional Violation

Claims that an officer used excessive force during the course of an arrest arise under the Fourth Amendment, which establishes an individual's right to be free from unreasonable seizures. Graham v. Connor, 490 U.S. 386, 394 (1989). In considering an excessive force claim, courts should apply an "objective reasonableness" standard to evaluate whether the force used in effectuating the arrest violated the arrestee's Fourth Amendment rights. Id. at 388. Such a determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (internal quotations omitted). Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. This is an objective test, and "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397.

Determining whether the force used was objectively reasonable "requires careful attention to the facts and circumstances of each particular case . . . ." <u>Id.</u> at 396. <u>Graham</u> requires that courts consider several specific factors, including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> Thus, "[i]n an excessive force case, an officer is entitled to qualified immunity if he acted reasonably under the circumstances confronting him." <u>Alford v. Cumberland County</u>, 2007 WL 2985297 *3 (4th Cir. Oct. 15, 2007) (unpublished) (<u>citing</u> <u>Rowland v. Perry</u>, 41 F.3d 167, 173 (4th Cir. 1994)). Whether his actions were reasonable is a legal question for the court, not a factual question for the jury. <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8 (2007).

This case presents an unusual circumstance in that, when viewed in the light most favorable to Andersen, the force used by Haynes occurred in the course of an unlawful arrest being legally resisted by Andersen. In similar scenarios, the Fourth Circuit has found that the lack of probable cause to arrest should be

considered under the first <u>Graham</u> factor, the severity of the crime at issue.[3]  <u>See</u> <u>Bailey v. Kennedy</u>, 349 F.3d 731, 743-44 (4th Cir. 2003).  The first <u>Graham</u> factor weighs heavily in Andersen's favor, given that, when Haynes arrested Andersen, he had no probable cause to believe Andersen had committed a crime.

Next, this is not a case in which the suspect posed an immediate threat to the safety of the officer or others.  <u>Id.</u>  In the first place, Andersen was not physically close to Haynes when Haynes initiated the arrest.  Indeed, Haynes "charged" across the lawn at Andersen, who was entering his car, and "lunged" into the car, landing on top of Andersen. Because Andersen did not pose an immediate threat to Haynes's safety prior to the initiation of the force, this factor weighs in favor of Andersen as well.

---

[3]     Several other circuits have held that consideration of an excessive force claim should be entirely separate from the question of whether probable cause existed for the arrest.  <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1160 (10th Cir. 2008) ("Although we have concluded that Fogarty's arrest was not supported by probable cause, this does not mean that the force used to arrest him was automatically excessive, as the two inquiries are entirely independent."); <u>see</u> <u>also</u>, <u>Freeman v. Gore</u>, 483 F.3d 404, 417 (5th Cir. 2007) ("Freeman's excessive force claim is separate and distinct from her unlawful arrest claim, and we must therefore analyze the excessive force claim without regard to whether the arrest itself was justified.").  The Fourth Circuit, however, does not appear to follow this distinction.

The only factor at issue, therefore, is whether Andersen was actively resisting or attempting to evade arrest by flight. Andersen denies that Haynes told him he was under arrest prior to initiating the force; thus, under Andersen's version of the events, he could not have been resisting or attempting to evade arrest by flight at that time. When Haynes yelled at Andersen and ordered him to get out of his car, he did so after having challenged Andersen to a fight only a few minutes before. Consequently, Haynes could not reasonably have expected Andersen, who contends he was attempting to avoid physical confrontation with Haynes by leaving the scene, to get out of his car at that point.

Moreover, after Haynes jumped into the car and landed on top of Andersen, he dug his finger into Andersen's eye and also bit down on Andersen's finger. Given that Andersen was lying beneath Haynes at that point, he was hardly in a position to flee or physically harm Haynes. Finally, once Haynes had placed Andersen in handcuffs, despite the fact that Andersen was restrained and clearly unable to flee or physically harm him, Haynes dragged him into the middle of the road, forced him onto his hands and knees,

and rammed his knee into Andersen's back, "jump[ing] up and down on him," and causing Andersen extreme pain.  Pl's Ex. C, p. 165.[4]

When the facts alleged by Andersen are viewed as true, he has easily established a claim that Haynes used excessive force in violation of the Fourth Amendment.

### ii.  Clearly Established Right

"It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force." Valladares, 552 F.3d at 388) (citing Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005)).  The question remains, however, whether a reasonable officer in Haynes's position would have known that the force used was excessive.  See id. ("In order for the right to be clearly established it must be[]

_____

[4]     The Court acknowledges that force used against an arrestee or pretrial detainee should be analyzed under the Fourteenth Amendment, rather then the Fourth Amendment.  "The point at which Fourth Amendment protections end and Fourteenth Amendment protections begin is often murky." Orem v. Rephann, 523 F.3d 442 446 (4th Cir. 2008).  In this case, some of the force in issue was used after Haynes had handcuffed Andersen, and while he was waiting for back-up officers to arrive.  The record does not indicate whether Andersen had been advised of his Miranda rights, or otherwise formally arrested at that point.  In Bailey v. Kennedy, 349 F.3d 731, 745 (4th Cir. 2003), the Fourth Circuit analyzed force used after the suspect was in handcuffs and leg restraints, but before he had been transported, as an excessive force claim under the Fourth Amendment.  This Court will follow Bailey's guidance in this case.

'sufficiently clear that a reasonable official would understand that what he is doing violated that right. . . .'") (quoting Creighton, 483 U.S. at 640). Importantly, a right can be "clearly established" without having been specifically addressed by a previous court decision. See Creighton, 483 U.S. at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . .").

Here, there can be no doubt that, when the facts are viewed in the light most favorable to Andersen, a reasonable officer in Haynes's position would have known that his actions violated Andersen's rights. On the face of it, the facts alleged by Andersen establish that Haynes attempted to goad Andersen into a fight and then pursued him when he retreated. Haynes then lunged into Andersen's car, landing on top of him without first telling Andersen he was under arrest. He gouged his finger into Andersen's eye, bit Andersen's finger, and ultimately sprayed Andersen with pepper spray, all without having probable cause to arrest. While the Court has found no case law clearly establishing a right to be free from such force in the same or similar circumstances, it concludes that no reasonable officer could have believed such actions were appropriate and lawful under the circumstances.

The Court recognizes that, in <u>Wilson v. Flynn</u>, 429 F.3d 465, 468 (4th Cir. 2005), the Fourth Circuit concluded that the question of whether an officer had informed a suspect that he was under arrest prior to attempting to handcuff him did not preclude the officer from obtaining qualified immunity on the suspect's excessive force claim.  The facts of that case, however, are distinguishable from those here.  First, unlike Haynes, the officer in <u>Wilson</u> had no previous connection to or dispute with the suspect.  <u>See</u> <u>id.</u> at 466-67.  Second, unlike Andersen, the suspect was drunk at the time of the arrest, and the officer, who had been summoned by the suspect's wife, witnessed the suspect threaten her and her young child.  <u>Id.</u>  Further, the wife had informed the officer that a gun was present in the house and that she had hidden it from her husband.  <u>Id.</u> at 466.  Given this background, the Fourth Circuit concluded that, even if the officer had failed to inform the suspect that he was under arrest prior to his attempt to handcuff him, during which the suspect resisted the officer and a scuffle ensued, the force used during that scuffle was objectively reasonable.  <u>Id.</u> at 469.

In <u>Wilson</u>, the Fourth Circuit distinguished the facts from others in which § 1983 plaintiffs had not committed a crime when alleged excessive force was used against them, <u>id.</u> at 468, and,

43

further, found it significant that the alleged excessive force undisputedly ceased after the suspect was finally in handcuffs. Id. at 469. When the facts are viewed in the light most favorable to Andersen, however, this case involves no criminal activity at the time the alleged excessive force was employed, and the alleged excessive force did not cease once Andersen was in handcuffs.

Finally, with regard to Haynes's actions immediately after handcuffing Andersen, in Jones v. Buchanan, 325 F.3d 520, 534 (4th Cir. 2003), a case decided before the events in this case, the Fourth Circuit stated that:

> [Y]ears before 1999, it was clearly established that a police officer was not entitled to use unnecessary, gratuitous, and disproportionate force against a handcuffed, secured citizen, who posed no threat to the officer or others and had neither committed, nor was suspected of committing, any crime.

As Andersen has alleged it, Haynes repeatedly jumped up and down on him while ramming his knee in Andersen's back, and used gratuitous and disproportionate force against Andersen after he was handcuffed and secured. Because a reasonable officer would have understood that these actions violated a clearly established right, Haynes is not entitled to qualified immunity on this ground at this time.

44

### d. Eighth Amendment Cruel and Unusual Punishment Claim

In his Amended Complaint, Andersen claims that Haynes subjected him to cruel and unusual punishment in violation of the Eighth Amendment, by inflicting physical harm on him after he had been taken into custody. Neither Andersen nor Haynes briefed this issue in response to the motion for summary judgment, but the Court will assume that Andersen's claim relates to Haynes's alleged conduct after he handcuffed Andersen, but before the police cruiser arrived, since Andersen has not alleged any misconduct after that point.

The Eight Amendment pertains solely to punishments that occur after a defendant has been convicted. <u>U.S. v. Hall</u>, 551 F.3d 257, 273 (4th Cir. 2009) ("The Eighth Amendment has no application here, however, because the Defendants were pretrial detainees rather than convicted prisoners."). In this case, the charges against Andersen were ultimately dismissed after a diversionary period; thus, he was never convicted on any charge. Consequently, no constitutional violation under the Eighth Amendment could have occurred, and Haynes is entitled to qualified immunity on this claim.

### 2.    State Law Claims Against Haynes

Andersen has alleged several state law claims against Haynes, including the tort of outrage, intentional infliction of emotional distress, battery, defamation, and false imprisonment.  Bonnie Andersen, as well, has claimed loss of consortium as to these causes of action.  Haynes asserts that he is immune from these claims under the West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1 et seq.

West Virginia Code § 29-12A-5(b) immunizes an employee of a political subdivision from liability on state law claims unless:

    (1)  His [] acts or omissions were manifestly outside the scope of employment or official responsibilities;

    (2)  His [] acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

    (3)  Liability is expressly imposed upon the employee by a provision of this code.

Because the Court has already concluded that a genuine issue of material fact exists as to what actually occurred during the events in question in this case, it is impossible to determine at this stage whether Haynes's actions were done "with malicious purpose, in bad faith, or in a wanton or reckless manner." There remain questions of fact for a jury to decide. Id. Consequently, Haynes

is not entitled to qualified immunity at this time on the state law claims raised against him.

Finally, Haynes contends that Andersen's claims of false imprisonment and defamation are barred by the applicable statute of limitations.   Andersen has conceded that his claim of false imprisonment is time-barred, but contends that his defamation claim remains viable.

Under West Virginia law, an action for defamation is subject to a one-year statute of limitations.  W. Va. Code § 55-2-12; Garrison v. Herbert J. Thomas Memorial Hosp. Ass'n, 438 S.E.2d 6, 13 (W. Va. 1993).  "In defamation actions, the period of the statute of limitations begins to run when the fact of the defamation becomes known, or reasonably should have become known, to the plaintiff." Syl. Pt. 1, Padon v. Sears, Roebuck & Co., 411 S.E.2d 245 (W. Va. 1991).

According to Andersen, Haynes defamed him by publically representing, both orally and in writing, that Andersen had engaged in criminal conduct.  Specifically, he asserts that the criminal charges of disorderly conduct, obstructing an officer, and battery of an officer filed by Haynes constitute libel.  He does not dispute that Haynes filed the charges more than one year before he filed the complaint in this case; nor does he dispute that a one-

year state of limitations applies to defamation claims.  Rather, he

contends that, in the context of a defamation claim based on a

wrongfully-filed criminal charge, the "continuing tort" theory

extends the date on which the statute of limitations begins to run

until the date the criminal charges were dismissed.  In other

words, Andersen contends that the libel contained in the criminal

charges wrongfully filed by Haynes constituted a continuing or

repeated injury that did not cease until those charges were

dismissed.  Because the charges were not dismissed until October

26, 2006, less than one year before he filed the complaint in this

case, Andersen argues that his claim is not time-barred.  See Dkt.

No. 62, Ex. 8.

    The West Virginia Supreme Court of Appeals has held that

"[w]here a tort involves a continuing or repeated injury, the . . .

statute of limitations begins to run from the date of the last

injury or when the tortious overt acts or omissions cease."  Syl

Pt. 11, Graham v. Beverage, 566 S.E.2d 603 (W. Va. 2002).  However,

"the concept of a continuing tort requires a showing of

repetitious, wrongful conduct."  Ricottilli v. Summersville

Memorial Hospital, 425 S.E.2d 629, 632 (W. Va. 1992).  Thus, "a

wrongful act with consequential continuing damages is not a

continuing tort."  Id.

Here, Andersen has not alleged any facts establishing that Haynes engaged in "repetitious, wrongful conduct." Although the criminal charges filed by Haynes remained pending for well over a year, they were only filed once. Thus, any libelous acts by Haynes constitute "a wrongful act with consequential continuing damages," and thus are inappropriate for consideration under the continuing tort theory. See Blanks v. Greyhound, Inc., 2007 WL 676195 (S.D.W. Va. Feb. 28, 2007) (holding that the continuing tort theory did not extend to a defamation action). Accordingly, it is not necessary to consider whether a claim for defamation could be sustained against Haynes because Andersen's defamation claim is time-barred.

## V. CONCLUSION

For the reasons discussed, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the defendants' motion for summary judgment (dkt. no. 62). Specifically, it **GRANTS** the motion of the City of Sistersville and **DISMISSES WITH PREJUDICE** all of the Andersens' federal and state claims as to that defendant. It **GRANTS** Haynes's motion for qualified immunity as it relates to Andersen's Eighth Amendment § 1983 claim, and **DISMISSES WITH PREJUDICE** Andersen's false imprisonment and defamation claims as barred by the statute of limitations. The Court, however, **DENIES** the Haynes's motion for

summary judgment as it pertains to the remainder of the claims against him.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

DATED: August 21, 2009.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE